No. 14–1290

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

IN RE: CELEXA AND LEXAPRO MARKETING AND
SALES PRACTICES LITIGATION
_____

RANDY and BONNIE MARCUS, on behalf of
themselves and all other persons similarly situated,

*Plaintiffs-Appellants,*

-against-

FOREST LABORATORIES, INC. and FOREST PHARMACEUTICALS, INC.,

*Defendants–Appellees.*
_____

Appeal from the United States District Court
for the District of Massachusetts
Judge Nathaniel M. Gorton, Civ. No. 09–MD–2067 (NMG)

BRIEF OF DEFENDANTS–APPELLEES

**SUGARMAN, ROGERS,**
**BARSHAK & COHEN, P.C.**
William F. Benson (#87982)
101 Merrimac Street
Boston, MA 02114
Tel.:  (617) 227-3030
Fax.: (617) 523-4001

**DEBEVOISE & PLIMPTON LLP**
Edwin G. Schallert (#45274)
Kristin D. Kiehn
J. Robert Abraham
Danielle E. Kasten
919 Third Avenue
New York, NY 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

*Attorneys for Defendants-Appellees*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel states that Forest Laboratories, LLC, formerly known as Forest Laboratories, Inc., is a wholly owned subsidiary of Tango U.S. Holdings, Inc. ("Tango"). Tango is a wholly owned subsidiary of Actavis plc, a publicly traded company that has no parent corporation and no publicly held company owning 10% or more of its stock.

Forest Pharmaceuticals, Inc. is a wholly owned subsidiary of Forest Laboratories, LLC.

Dated:    September 2, 2014                    Respectfully submitted,


                                              /s/ Edwin G. Schallert


SUGARMAN, ROGERS, BARSHAK        DEBEVOISE & PLIMPTON LLP
& COHEN, P.C.
101 Merrimac Street              919 Third Avenue
Boston, MA 02114                 New York, NY 10022
Tel.: (617) 227–3030             Tel.: (212) 909–6000
Fax.: (617) 523-4001             Fax: (212) 909–6836

*Of counsel*:                    *Of counsel*:

William F. Benson (#87982)       Edwin G. Schallert (#45274)
benson@srbc.com                  Kristin D. Kiehn
                                 J. Robert Abraham
                                 Danielle E. Kasten
                                 egschall@debevoise.com
                                 kdkiehn@debevoise.com
                                 jrabraha@debevoise.com
                                 dekasten@debevoise.com

## <u>TABLE OF CONTENTS</u>

RULE 26.1 DISCLOSURE STATEMENT................................................ i

PRELIMINARY STATEMENT .................................................................1

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF THE CASE................................................................4

STATEMENT OF FACTS ......................................................................5

    A.    The FDA Has Sole Authority To Determine Whether
        Prescription Drugs Are Effective For Their Intended Uses.................5

    B.    The FDA Concluded That Lexapro Is Effective For the
        Treatment of Adolescent Depression. ...................................9

    C.    The FDA Approved Lexapro's Label and Determined That
        It Is Not False or Misleading in Any Particular. ...................10

    D.    The Complaint Alleges That Lexapro's FDA-Approved
        Label is False and Misleading............................................12

    E.    Forest's Motion to Dismiss the Complaint. .........................15

    F.    The District Court's Order. ...............................................15

SUMMARY OF ARGUMENT ..............................................................16

STANDARD OF REVIEW ...................................................................17

ARGUMENT .......................................................................................18

    A.    The District Court Correctly Held that Plaintiffs' Claims Are
        Barred By the California Safe-Harbor Doctrine. ................18

        1.  The Order Is Supported by Well-Settled Law....................19

        2.  The Order Is Not Inconsistent with *Wyeth v. Levine*. ........25

        3.  The Order Did Not Fail to Take Account of Purported "Parallel"
           Violations of State and Federal Law..................................30

4. Certification to the California Supreme Court is Inappropriate and Unwarranted. ........................................................................................32

B.   In the Alternative, the District Court's Order Should Be Affirmed Because Plaintiffs' Claims Are Preempted By Federal Law. ........................................................................................34

CONCLUSION ........................................................................................43

## TABLE OF AUTHORITIES

### CASES

*Aetna Life Ins. Co. v. Bayona*,
    223 F.3d 1030 (9th Cir. 2000) ............................................................35

*Alvarez v. Chevron Corp.*,
    656 F.3d 925 (9th Cir. 2011) .............................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................17

*Ball v. Takeda Pharm. Am., Inc.*,
    963 F. Supp. 2d 497 (E.D. Va. 2013) ...........................................21, 30

*Begley v. Bristol-Myers Squibb Co.*,
    Nos. 06–6051, 6269 (FLW)
    2009 WL 5216967 (D.N.J. Dec. 30, 2009)........................................23

*Bober v. Glaxo Wellcome PLC*,
    246 F.3d 934 (7th Cir. 2001) .........................................................20, 21

*Bronson v. Johnson & Johnson, Inc.*,
    No. C 12–04184 CRB
    2013 WL 1629191 (N.D. Cal. Apr. 16, 2013)...................................29

*Bruton v. Gerber Prods. Co.*,
    961 F. Supp. 2d 1062 (N.D. Cal. 2013).............................................30

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)......................................................................31, 38

*Butler v. Deutsche Bank Trust Co. Ams.*,
    748 F.3d 28 (1st Cir. 2014)...............................................................17

*Cel-Tech Comms., Inc. v. Los Angeles Cellular Telephone Co.*,
    973 P.2d 527 (Cal. 1999)...............................................................19, 25

*Cruz v. Cingular Wireless, LLC*,
    648 F.3d 1205 (11th Cir. 2011) ........................................................35

*Cytyc Corp. v. Neuromedical Sys., Inc.*,
    12 F. Supp. 2d 296 (S.D.N.Y. 1998) ........................................................... 10, 22

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ............................................................... 19

*Delarosa v. Boiron, Inc.*,
    818 F. Supp. 2d 1177 (C.D. Cal. 2011) ............................................... 29

*DePriest v. AstraZeneca Pharm., L.P.*,
    351 S.W.3d 168 (Ark. 2009) ................................................................ 21

*Eckhardt v. Qualitest Pharm., Inc.*,
    751 F.3d 674 (5th Cir. 2014) ............................................................... 36

*Fischer v. Bar Harbor Banking & Trust Co.*,
    857 F.2d 4 (1st Cir. 1988) ............................................................... 33, 34

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995) ............................................................................ 35

*Fuller v. Deutsche Bank Nat'l Trust Co.*,
    642 F.3d 240 (1st Cir. 2011) ............................................................... 34

*Garcia v. Wyeth-Ayerst Labs.*,
    385 F.3d 961 (6th Cir. 2004) ............................................................... 31

*Hill v. Novartis Pharm. Corp.*,
    944 F. Supp. 2d 943 (E.D. Cal. 2013) ................................................. 37

*Hillman v. Maretta*,
    133 S. Ct. 1943 (2013) ................................................................... 35, 39

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .............................................................................. 35

*Hugel v. Milberg, Weis, Bershad, Hynes & Lerach, LLP*,
    175 F.3d 14 (1st Cir. 1999) ........................................................... 32, 33

*In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,
    No. M:05–1699 CRB
    2006 WL 2374742 (N.D. Cal. Aug. 16, 2006) ............................... 27, 28, 39

*In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*,
  756 F.3d 917 (6th Cir. 2014) ...............................................................36

*In re Engage, Inc.*,
  544 F.3d 50 (1st Cir. 2008)..................................................................33

*In re Fosamax Prods. Liab. Litig.*,
  951 F. Supp. 2d 695 (D.N.J. 2013)......................................................39

*In re Fosamax Prods. Liab. Litig.*,
  No. 08–008, 2011 WL 5903623 (D.N.J. Nov. 21, 2011) ...................36

*In re Marron*,
  485 B.R. 485 (D. Mass. 2012) .............................................................33

*Johnson v. MFA Petroleum Co.*,
  No. 4:11–CV–00981–DGK,
  2014 WL 1292453 (W.D. Mo. Mar. 28, 2014) ...................................38

*Lashley v. Pfizer, Inc*,
  750 F.3d 470 (5th Cir. 2014) (per curiam) ........................................31

*Ledwick v. AstraZeneca Pharms., LP*,
  No. BC 324 518 (Cal. Super. Ct. Sept. 21, 2005)........................22, 23

*Loeffler v. Target Corp.*,
  324 P.3d 50 (Cal. 2014) ...............................................................20, 24

*Lopez v. Nissan N. Am. Inc.*,
  135 Cal. Rptr. 3d 116 (Cal. Ct. App. 2011).......................................20

*Lynch v. Tropicana Prods., Inc.*,
  No. 2:11–cv–07382 (DMC) (JAD),
  2013 WL 2645050 (D.N.J. June 12, 2013).........................................30

*Mut. Pharm. Co, Inc. v. Bartlett*,
  133 S. Ct. 2466 (2013)...................................................7, 26, 35, 36

*Pardini v. Unilever U.S., Inc.*,
  961 F. Supp. 2d 1048 (N.D. Cal. July 9, 2013) ..................................29

*Penn. Emp. Benefit Trust Fund v. Zeneca, Inc.*,
No. Civ. 05–075–SLR
2005 WL 2993937 (D. Del. Nov. 8, 2005)........................................................27

*Penn. Emp. Benefit Trust Fund v. Zeneca, Inc.*,
499 F.3d 239 (3d Cir. 2007) ..............................................................................28

*Penn. Emp. Benefit Trust Fund v. Zeneca, Inc.*,
710 F. Supp. 2d 458 (D. Del. 2010)..................................................................28

*PLIVA, Inc. v. Mensing*,
131 S. Ct. 2567 (2011)................................................................3, 25, 35, 36

*Prohias v. AstraZeneca Pharm., L.P.*,
958 So.2d 1054 (Fla. Dist. Ct. App. 2007)......................................................21

*Prohias v. Pfizer, Inc.*,
490 F. Supp. 2d 1228 (S.D. Fla. 2007)....................................10, 21, 22, 27, 39

*Rocket Learning, Inc. v. Rivera-Sanchez*,
715 F.3d 1 (1st Cir. 2013)..................................................................................17

*Samaan v. St. Joseph Hosp.*,
670 F.3d 21 (1st Cir. 2012)................................................................................34

*Samet v. Procter & Gamble Co.*,
No. 5:12–CV–01981 PSG,
2013 WL 3124647 (N.D. Cal. June 18, 2013)............................................29, 30

*Sarro v. Philip Morris USA, Inc.*,
No. 08–10224–MLW,
2010 WL 1930442 (D. Mass. May 12, 2010)....................................................33

*Smith v. Wyeth-Ayerst Labs. Co.*,
278 F. Supp. 2d 684 (W.D.N.C. 2003)..............................................................12

*Smithkline Beecham Consumer Healthcare, L.P., v. Johnson & Johnson–
Merck Consumer Pharms., Co.*,
Nos. 95 CIV. 7011 (HB), 95 CIV. 7688 (HB),
1996 WL 280810 (S.D.N.Y. 1996).............................................................10, 22

*State v. Eli Lilly & Co.*,
　　No. 2007–CP–42–1855,
　　2009 WL 6058384 (S.C. Ct. Com. Pl. Sept. 22, 2009) .....................................23

*Thompson v. Allergan USA, Inc.*,
　　993 F. Supp. 2d 1007 (E.D. Mo. 2014) .............................................................40

*Van Koenig v. Snapple Beverage Corp.*,
　　713 F. Supp. 2d 1066 (E.D. Cal. 2010) .............................................................29

*Wilson v. HSBC Mortg. Servs., Inc.*,
　　744 F.3d 1 (1st Cir. 2011)...................................................................................34

*Wyeth v. Levine*,
　　555 U.S. 555 (2009)...................................................................................*passim*

*Zogenix, Inc. v. Patrick*,
　　No. 14–11689–RWZ,
　　2014 WL 1454696 (D. Mass. Apr. 15, 2014)...................................................38

**STATUTES**

21 U.S.C. §§ 301 *et seq.*.........................................................................................15

21 U.S.C. § 331 .............................................................................................2, 8, 22

21 U.S.C. § 333 .............................................................................................2, 8, 22

21 U.S.C. § 352 .............................................................................................2, 8, 22

21 U.S.C. § 355 ..........................................................................................2, 6, 7, 8

21 U.S.C. § 393 ............................................................................................2, 5, 37

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ..........................................................5, 14

Cal. Bus. & Prof. Code §§ 17500–17509 ...........................................................5, 13

Cal. Civ. Code §§ 1750 *et seq.*...........................................................................5, 13

**OTHER AUTHORITIES**

U.S. Const. art. vi, cl. 2 ...........................................................................................35

21 C.F.R. § 201.56 ...................................................................31

21 C.F.R. § 201.57 ...................................................................31

21 C.F.R. § 314.3 .....................................................................41

21 C.F.R. § 314.50 .......................................................6, 7, 8, 32

21 C.F.R. § 314.70 .....................................................39, 40, 42

21 C.F.R. § 314.105 .............................................................6, 8

21 C.F.R. § 314.125 .......................................................2, 8, 10, 32

21 C.F.R. § 314.126 ...................................................................7

Supplemental Applications Proposing Labeling Changes for Approved
    Drugs, Biologics, & Med. Devices,
    73 Fed. Reg. 49,603 (Aug. 22, 2008) .................................8

Supplemental Applications Proposing Labeling Changes for Approved
    Drugs, Biologics, & Med. Devices,
    73 Fed. Reg. 2851 (Jan. 16, 2008)..................................38, 40

U.S. Dep't of Health & Human Servs., *et al.*,
    *Guidance for Industry: Changes to an Approved NDA or ANDA* (2004)..........40

U.S. Gov't Accountability Office, Report to Congressional Requesters: New
    Drug Development—Science, Business, Regulatory, and Intellectual
    Property Issues Cited as Hampering Drug Development Efforts,
    26 Biotechnology L. Rep. 82, 94 (2007) .............................7

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004).. ......................41

Defendants-Appellees Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. ("Forest") submit this brief in response to the brief of Plaintiffs-Appellants ("Plaintiffs").[1]

## PRELIMINARY STATEMENT

Plaintiffs' Complaint seeks to challenge the decision by the U.S. Food and Drug Administration ("FDA") to approve the antidepressant Lexapro as an effective treatment for adolescent depression.  The Complaint does not allege that Lexapro is unsafe for adolescents.  Instead, the Complaint is premised on the remarkable allegation that the FDA-approved label itself is materially false and misleading because it indicates that "Lexapro is effective in treating adolescent [depression] when it is not."  *See* Appx. 2, 32 (Compl. ¶¶ 1, 72).  Plaintiffs allege that Forest violated California's consumer fraud laws by distributing Lexapro with its FDA-approved label.  *See id.* at 2 (Compl. ¶ 1).

The District Court properly concluded that California's safe-harbor doctrine bars Plaintiffs' claims.  Pl. Add. 58 (Order at 7).  The doctrine provides that conduct specifically authorized by federal or state law cannot form the basis of a

---

[1]  All references to "Order" refer to the Memorandum & Order issued by the District Court in *In re Celexa & Lexapro Marketing & Sales Practices Litigation*, Case. No. 09–MD–2067 (NMG) (D. Mass. Mar. 5, 2014), which is contained in the Addendum to Plaintiffs' Brief at 52–63.  All references to "Appx." refer to the Appendix filed by Plaintiffs.  All references to "Pl. Br." refer to Plaintiffs' opening brief in this appeal. All references to "Pl. Add." refer to the Addendum to Plaintiff's opening brief.

consumer protection violation. The District Court noted that Congress has delegated to the FDA sole authority for evaluating prescription drug efficacy and determining whether drug labels are false or misleading. *See id.* at 60 (Order at 9). Accordingly, California's safe harbor bars state-law claims that a prescription drug label is false or misleading. *See id.* The District Court correctly dismissed the Complaint on this ground.

*First*, Congress has entrusted the FDA with exclusive authority to determine whether prescription drugs are effective for their intended uses. *See, e.g.*, 21 U.S.C. § 393(b). In 2009, the FDA approved Forest's application to market Lexapro as a safe and effective treatment for adolescent depression. *See* Appx. 65 (Compl. ¶ 52). In accordance with federal regulations, the FDA conducted an independent review of the relevant clinical data and determined there is substantial evidence of efficacy in adolescent patients. *See* 21 U.S.C. § 355(d). The FDA also approved Lexapro's label prior to authorizing the marketing of the drug for adolescents, which entailed a statutorily mandated determination that the label is neither false nor misleading in any particular. *See id.* § 355(d)(7); 21 C.F.R. § 314.125(b)(6). Once approved, manufacturers are required to distribute prescription drugs with their FDA-approved label or face criminal penalties. *See* 21 U.S.C. §§ 331(c), 333(a) & 352(a), (c). The District Court recognized that permitting liability under state law for distributing a false and misleading drug

label would penalize Forest for engaging in conduct expressly authorized—indeed mandated by—federal law, a result barred by California's safe harbor doctrine.

*Second*, even if Plaintiffs' claims were permissible under California law—which they are not—the claims are preempted by federal law, which provides an alternative ground for affirming the District Court's judgment. Pursuant to the Supreme Court's seminal decision in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567 (2011), and its progeny, state-law claims that disrupt the objectives of Congress or seek to impose a duty a manufacturer cannot independently satisfy consistent with its obligations under federal law are preempted. Here, the FDA has already adjudicated the very issues that Plaintiffs seek to challenge—Lexapro's efficacy for adolescents, the proper scientific interpretation of the supporting clinical data, and the truth and accuracy of Lexapro's label. Permitting the Complaint to proceed would allow private plaintiffs to disrupt and undermine the system of prescription drug approval established by Congress. Furthermore, Forest cannot unilaterally make the labeling changes sought by Plaintiffs without obtaining the FDA's prior consent.

## STATEMENT OF ISSUES

(1)    Does California's safe-harbor doctrine bar consumer fraud claims that seek to hold a drug manufacturer liable for distributing an allegedly false and misleading drug label where the label was expressly approved by the FDA and found not to be false or misleading and where federal law requires the manufacturer to distribute the label with its product?

(2)    Are California consumer fraud claims asserting that a drug manufacturer's FDA-approved drug label is false and misleading preempted by federal law where the allegedly false and misleading statements were expressly approved by the FDA and where the manufacturer cannot alter the label without the FDA's prior consent?

## STATEMENT OF THE CASE

Plaintiffs, who assert they purchased Lexapro for their son, filed the Complaint in the United States District Court for the Central District of California on May 3, 2013.  The Complaint seeks to certify a class of California consumers who purchased Lexapro for use by an adolescent from March 2009—the date of Lexapro's FDA approval for adolescents—through the present.  *See* Appx. 31–32 (Compl. ¶¶ 71, 73).  The Complaint contends that Lexapro's FDA-approved label is false and misleading because it suggests that Lexapro is more effective at

treating adolescent depression than it actually is, *see id.* at 29–30 (Compl. ¶ 62), and brings claims under the California Consumer Legal Remedies Act ("CLRA"),[2] the False Advertising Law ("FAL")[3], and the Unfair Competition Law ("UCL").[4] *See id.* at 21, 76–82 (Compl. ¶¶ 1, 76–98).

The Complaint was transferred to the United States District Court for the District of Massachusetts (the "District Court") as a "tag-along" action to the Multidistrict Litigation captioned *In re Celexa and Lexapro Marketing and Sales Practices Litigation*, No. 09–MD–2067 (NMG) (D. Mass.). On March 5, 2014, the District Court entered an Order dismissing the Complaint on the ground that California's safe harbor doctrine bars Plaintiffs' claims.[5] Plaintiffs now appeal the Order.

## STATEMENT OF FACTS

### A. The FDA Has Sole Authority To Determine Whether Prescription Drugs Are Effective For Their Intended Uses.

Congress has entrusted to the FDA sole authority to approve prescription drugs for sale in the United States. *See, e.g.*, 21 U.S.C. § 393(b). Manufacturers

---

[2]    Cal. Civ. Code § 1750 *et seq.*

[3]    Cal. Bus. & Prof. Code §§ 17500–17509.

[4]    Cal. Bus. & Prof. Code § 17200 *et seq.*

[5]    *See* Pl. Add. 64 (Order of Dismissal, *Marcus, et al. v. Forest Pharm., Inc., et al.*, No. 13–CV–11343 (NMG) (D. Mass. Mar. 5, 2014); *see also* Pl. Add. 59–63 (Order at 8–12).

are required to obtain FDA approval before marketing a prescription drug. *See id.* § 355(a). To grant approval, the FDA must determine that the drug "meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling." 21 C.F.R. § 314.105(c); *see also* Appx. 46–47, 49 (Cmpl. ¶¶ 13 & 18).

Manufacturers seek FDA approval by submitting a New Drug Application ("NDA") or a Supplemental New Drug Application ("sNDA").[6] To meet the statutory standard for effectiveness, the FDA must determine that substantial evidence supports the conclusion that a drug is effective for its intended uses.[7] *See* 21 U.S.C. § 355(d); *see also* 21 C.F.R. § 314.105(c) (noting FDA is "required to exercise its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide for a particular drug to meet the statutory standards [for safety and effectiveness]"). An NDA or sNDA consists of a compilation of materials that includes "full reports of [all clinical] investigations," 21 U.S.C. § 355(b)(1)(A); 21 C.F.R. § 314.50(d)(5), relevant nonclinical studies, and "any other data or information relevant to an evaluation of

---

[6]  An sNDA is an application for approval to market an FDA-approved drug for a new indication or for use in a new patient population. NDAs and sNDAs are subject to the same legal requirements and review by the FDA. *See* 21 C.F.R. § 314 *et seq.*

[7]  Plaintiffs' attempt to portray FDA approval as a process that does not entail a finding that a drug is both safe and effective is irreconcilable with a plain reading of the statutory language. *See* Pl. Br. at 15; *see also* Appx. 47 (Cmpl. ¶ 14) ("FDA approval of a medication for a specific indication does not mean that the drug is necessarily safe and effective . . . .").

the safety and effectiveness of the drug product . . . "[8]  21 C.F.R. § 314.50(d)(2) &

(d)(5)(iv).  The FDA refuses approval if the drug lacks either "adequate tests . . . to

show whether or not [the] drug is safe for use" or "substantial evidence that the

drug will have the effect it purports or is represented to have . . . ."  21 U.S.C. §

355(d)(1), (5).

Substantial evidence that a drug will have the effect it purports to have

generally consists of "adequate and well-controlled investigations, including

clinical investigations, by experts qualified by scientific training and experience to

evaluate the effectiveness of the drug involved . . . ."  *Id*. § 355(d); *see also* 21

C.F.R. § 314.126 (defining adequate and well-controlled studies).  "[D]ata from

one adequate and well-controlled clinical investigation and [other] confirmatory

evidence" may constitute "substantial evidence" if the FDA "determines, based on

relevant science, that [such] data . . . are sufficient to establish effectiveness."[9]  21

U.S.C. § 355(d).

---

[8]  The process of submitting an NDA or sNDA is "both onerous and lengthy."  *Mut. Pharm. Co, Inc. v. Bartlett,* 133 S. Ct. 2466, 2471 (2013); *see also* U.S. Gov't Accountability Office, Report to Congressional Requesters: New Drug Development—Science, Business, Regulatory, and Intellectual Property Issues Cited as Hampering Drug Development Efforts, 26 Biotechnology L. Rep. 82, 94 (2007) (noting typical NDA spans thousands of pages and is based on clinical trials conducted over several years).

[9]  Plaintiffs erroneously assert—without citation—that if an "NDA contains [one statistically positive clinical trial and some confirmatory evidence] the FDA cannot disapprove the application."  Pl. Br. at 15.  To the contrary, the FDA "*may* consider such data and evidence to constitute substantial evidence," but is by no means required to do so.  21 U.S.C. § 355(d).

A drug's proposed label also undergoes rigorous review by the FDA. The NDA or sNDA must include "the labeling proposed to be used" for the drug, *id*. § 355(b)(1)(F), and "a discussion of why the [drug's] benefits exceed the risks under the conditions stated in the labeling." 21 C.F.R. § 314.50(d)(5)(viii). It must also include "[t]he proposed text of the labeling . . . with annotations to the information in the [application] that support the inclusion of each statement . . . ." *Id*. § 314.50(c)(2)(i). The FDA "undertakes a detailed review of the proposed label . . . allowing only information for which there is a scientific basis to be included . . . ." Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, & Med. Devices, 73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008). Before approving the NDA or sNDA, the FDA must determine, "based on a fair evaluation of all material facts," that the proposed label is not "false or misleading in any particular" or otherwise "does not comply with the requirements for labels and labeling." 21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6), (8). If any defects in the proposed label are identified, approval is "conditioned upon the applicant incorporating the specified labeling changes exactly as directed . . . ." 21 C.F.R. § 314.105(b).

Manufacturers are required to distribute prescription drugs with their FDA-approved label or face criminal penalties. *See* 21 U.S.C. §§ 331(c), 333(a), & 352(a), (c).

**B.     The FDA Concluded That Lexapro Is Effective For the Treatment of Adolescent Depression.**

Lexapro is an antidepressant manufactured and sold by Forest.  *See* Appx. 46 (Compl. ¶¶ 11–12).  Lexapro belongs to a class of antidepressants known as selective serotonin reuptake inhibitors ("SSRI"), which includes other well-known drugs such as Prozac, Paxil, and Zoloft.  *See id.* at 46 (Compl. ¶ 12).  Lexapro is closely related on a molecular level to Celexa, another SSRI manufactured and sold by Forest.[10]  *See id.* at 53 (Compl. ¶ 25).  SSRIs are commonly prescribed for the treatment of depression.  *See id*. at 45–46 (Compl. ¶¶ 10, 12).

In 2002, the FDA approved Lexapro as a safe and effective treatment for depression in adult patients, and, in 2003, as a safe and effective treatment for generalized anxiety disorder in adults.  *See id.* at 54 (Compl. ¶ 27).  In 2008, Forest submitted an sNDA to the FDA seeking approval to market Lexapro for the treatment for depression in adolescents aged 12 to 17 ("Lexapro sNDA").  *See id.* at 64 (Compl. ¶ 50).  The Lexapro sNDA included data from several clinical trials examining the safety and efficacy of Lexapro and Celexa in the treatment of pediatric depression, including Lexapro Study 32 and Celexa Study 18.  *See id.* at 64–65 (Compl. ¶¶ 50, 52).

---

[10]  Celexa and Lexapro have related active ingredients.  Specifically, the active ingredient in Celexa is citalopram, a racemic mixture of two enantiomers: escitalopram and R-citalopram.  The active ingredient in Lexapro is escitalopram.

In March 2009, the FDA approved the Lexapro sNDA.  *See id.* at 65 (Compl. ¶ 52).  As required by statute, the FDA made its own independent findings on the issue of efficacy, concluding based on its interpretation of the relevant clinical data that substantial evidence supports Lexapro's efficacy in treating adolescent depression.  *See id.* at 64–65 (Compl. ¶¶ 51–52).  The FDA's determination was based in part on its conclusion that Lexapro Study 32 and Celexa Study 18 are adequate and well-controlled studies that provide substantial evidence of efficacy for Lexapro.  *See id.* at 125 (Lexapro Label at 21).

## C.     The FDA Approved Lexapro's Label and Determined That It Is Not False or Misleading in Any Particular.

As part of its evaluation of the Lexapro sNDA, the FDA reviewed and approved Lexapro's proposed label.   Approval of the label required a determination by the FDA that the label is not "false or misleading in any particular."  21 C.F.R. § 314.125(b)(6).[11]  The label's FDA-approved statement of efficacy provides in relevant part:  "Safety and effectiveness of Lexapro has been established in adolescents (12 to 17 years of age) for the treatment of major

---

[11] *See also Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1235 (S.D. Fla. 2007) ("[I]nformation included in the labeling of a new drug reflects a determination by the FDA that the information is not 'false or misleading.'" (citations omitted)); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 301 (S.D.N.Y. 1998) (same); *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharms., Co.*, Nos. 95 CIV 7011 (HB), 95 CIV 7688 (HB), 1996 WL 280810, at *13 (S.D.N.Y. May 24, 1996) (holding advertisements were "neither facially false nor misleading" where claims were "based on the package labelling [sic] approved by the FDA").

depressive disorder." Appx. 68 (Compl. ¶ 57); *see also id*. at 121 (Lexapro label at 17). The "Clinical Studies" section of the label describes the underlying efficacy studies:

> <u>Adolescents</u>
>
> The efficacy of Lexapro as an acute treatment for major depressive disorder in adolescent patients was established in an 8-week, flexible-dose, placebo-controlled study that compared Lexapro 10–20 mg/day to placebo in outpatients 12 to 17 years of age inclusive who met DSM-IV criteria for major depressive disorder [Lexapro Study 32]. The primary outcome was change from baseline to endpoint in the Children's Depression Rating Scale – Revised (CDRS-R). In this study, Lexapro showed statistically significant greater mean improvement compared to placebo on the CDRS-R.
>
> The efficacy of Lexapro in the acute treatment of major depressive disorder in adolescents was established, in part, on the basis of extrapolation from the 8-week, flexible-dose, placebo-controlled study with racemic citalopram 20-40 mg/day [Celexa Study 18]. In this outpatient study in children and adolescents 7 to 17 years of age who met DSM-IV criteria for major depressive disorder, citalopram treatment showed statistically significant greater mean improvement from baseline, compared to placebo, on the CDRS-R; the positive result for this trial largely came from the adolescent subgroup.
>
> Two additional flexible-dose, placebo-controlled MDD studies (one Lexapro study in patients ages 7 to 17 [Lexapro Study 15] and one citalopram study in adolescents [Celexa Study 94404]) did not demonstrate efficacy.

*Id*. at 125 (Lexapro Label at 21).

**D.     The Complaint Alleges That Lexapro's FDA-Approved Label is False and Misleading.**

The Complaint asserts that Forest has a duty under California law "to fairly and honestly deal with consumers and prescribing healthcare professionals." Appx. 70 (Compl. ¶ 61). Forest allegedly violated this duty by "artfully omitting . . . material information" from Lexapro's FDA-approved label, with the result that "Forest misled consumers and prescribing healthcare professionals in violation of consumer protection law." *Id.* The Complaint alleges that Lexapro's FDA-approved label is "fundamentally misleading for a variety of reasons." *Id.* at 69 (Compl. ¶ 58); *see also id.* at 72–73 (Compl. ¶¶ 71–72).

*First*, the description of Celexa Study 18 as a positive study[12] allegedly is "materially false" because, in Plaintiffs' view, the study's evidence of statistical significance is "predicated on a manipulation of data." *Id.* at 69 (Compl. ¶ 58); *see also* Pl. Br. at 11–12. *Second*, the description of Lexapro Study 32 as a positive study allegedly is "misleading" because it "does not provide any indication that the difference between Lexapro and placebo" was, in Plaintiffs' view, "statistically marginal, and not clinically meaningful." Appx. 69–70 (Compl. ¶ 59); *see also* Pl. Br. at 12–13. *Third*, the label's statement that Lexapro is safe and effective for adolescent depression allegedly is "misleading" because, in Plaintiffs' judgment,

---

[12]   A "positive study" is a study that supports the conclusion, to a statistically-significant degree, that the tested medication is more effective than placebo in treating the tested condition. *See, e.g, Smith v. Wyeth-Ayerst Labs. Co.*, 278 F. Supp. 2d 684, 693 n.14 (W.D.N.C. 2003).

"the totality of the data, examined from every perspective, illustrates that Forest's representation [in the FDA-approved label] that Lexapro is an effective treatment for adolescent depression is unsupported." Appx. 70 (Compl. ¶ 60); *see also* Pl. Br. at 13.

The Complaint asserts that physicians and consumers relied on the FDA-approved label to their detriment by prescribing and purchasing a drug that was labeled as effective but which, Plaintiffs suggest, is a "side-effect ridden sugar pill." Appx. 32 (Compl. ¶ 72); *see also id*. at 72, 77 (Compl. ¶¶ 70, 80); Pl. Br. at 7. The Complaint also launches an attack on the FDA's approval process for antidepressants generally. The Complaint describes a number of articles and reports (many of which do not relate to Lexapro) which purportedly demonstrate that antidepressants lack efficacy as a class and that the FDA's approval process over the past decades has been seriously flawed. *See* Appx. 50–52, 57–58 & 65–67 (Compl. ¶¶ 21–22, 34–35 & 54–55).

The Complaint brings claims under the CLRA,[13] FAL,[14] and UCL.[15] *See id*. at 76–82 (Compl. ¶¶ 76–98). Included in the relief sought is an injunction barring

---

[13] The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the lease or sale of goods or services to a consumer. Cal. Civ. Code § 1770(a).

[14] The FAL prohibits companies from knowingly or unreasonably making or disseminating an untrue or misleading statement in an attempt to sell a product. Cal. Bus. & Prof. Code §§ 17500–17509.

the sale of Lexapro with its current FDA-approved label and an order directing Forest to seek FDA approval of a new label that "properly discloses" Lexapro's efficacy (or alleged lack thereof) in treating adolescent depression. *Id.* at 84 (Compl. ¶ 103).

Although Plaintiffs make generalized references to Forest's "marketing" of Lexapro, Pl. Br. at 7, and to the drug's "labeling and advertising," *id.* at 6,[16] their claims are based solely on Lexapro's FDA-approved label. The Complaint references alleged omissions and misrepresentations in the label on at least eighteen (18) occasions, but does not contain a single particularized allegation regarding Forest's promotion, advertising, or marketing of Lexapro apart from its distribution of the label, not to mention any allegation that Forest's marketing or promotion was inconsistent with the label.[17] *See, e.g.*, Appx. 75 (Compl. ¶ 75) ("[U]nder California [law], the question of Forest's conduct, *i.e. whether the drug*

---

[15] The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

[16] Plaintiffs' references to Forest's plea to a strict liability misdemeanor, which related exclusively to the marketing of *Celexa between 1998 and 2002*, are completely irrelevant. *See* Pl. Br. at 2–3 & n.1. Furthermore, having apparently failed to read or understand Federal Rule of Evidence 408, Plaintiffs cite to a recent class action settlement in which Forest explicitly denied any liability or wrongdoing. *See id.* The settlement involved claims of off-label promotion of Celexa and Lexapro dating back to 1998 and involved Missouri residents and claims under a distinct Missouri statute, none of which have any bearing on this appeal.

[17] *See also* Appx. 43, 67–73, 77–79 & 83–85 (Compl. ¶¶ 1, 56–62, 65, 68–69, 71, 80–81, 83, 100 & 103).

*label was misleading*, predominates over any individual issues." (emphasis added)).

## E.    Forest's Motion to Dismiss the Complaint.

On July 29, 2013, Forest moved to dismiss the Complaint on multiple grounds, including:  (*i*) Plaintiffs' claims are barred by California's safe harbor doctrine because the FDA concluded that Lexapro is effective for adolescent depression, determined that the related statements in its label are not false or misleading, and authorized the label's distribution, and (*ii*) Plaintiffs' claims are preempted by the Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, and its implementing regulations because Forest could not unilaterally make the labeling changes it allegedly had a state-law "duty" to make—changes which contradict the FDA's own scientific conclusion—without first obtaining FDA approval.[18]

## F.    The District Court's Order.

On March 5, 2014, the District Court dismissed the Complaint in its entirety pursuant to California's safe-harbor doctrine.  *See* Pl. Add. 58 (Order at 7).  The District Court concluded that Congress has entrusted the FDA with authority to make determinations about drug efficacy and the accuracy of proposed labeling.

---

[18]    *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the *Marcus* Complaint at 10–12, *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, No. 09–MD–2067 (NMG) (D. Mass. July 29, 2013) (DE 244).

As a result, California's safe-harbor doctrine bars a state-law claim that Lexapro's FDA-approved label is false and misleading. *See id.* at 60 (Order at 9). The District Court noted that the safe-harbor doctrine "reflects a judgment by the California Supreme Court that California's unfair competition law should not be employed to second guess legislative judgments." *Id.* The Court did not reach Forest's argument based on federal preemption. *See id.* at 58 (Order at 7).

## SUMMARY OF ARGUMENT

The District Court's dismissal of the Complaint applied settled law. California courts have long recognized that conduct specifically authorized by federal or state regulation is exempt from consumer protection liability under state law. Moreover, other courts have consistently held that marketing claims consistent with statements in FDA-approved labels are protected by similar state-law safe harbors. Contrary to Plaintiffs' assertions, *Wyeth v. Levine*, 555 U.S. 555 (2009)—a case concerned with federal preemption of state-law failure-to-warn claims—does not disturb these precedents. Claims based on the novel theory that Plaintiffs assert here—that Lexapro's label itself is false and misleading—are barred by established case law.

Even if the safe-harbor doctrine did not apply, the claims are preempted by federal law because Forest cannot unilaterally alter the allegedly misleading statements without obtaining prior approval from the FDA. Indeed, the changes

that Plaintiffs assert Forest had a state-law "duty" to make directly conflict with the FDA's prior determination that Lexapro is effective in treating adolescent depression, its interpretation of the underlying clinical data, and its determination that the label is not false or misleading. Accordingly, there is an ample alternative basis for affirming the District Court's Order on preemption grounds.

Finally, certification of any state-law question to the California Supreme Court is both unwarranted and inappropriate. The Order should be affirmed.

## STANDARD OF REVIEW

A district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo*. *See, e.g., Butler v. Deutsche Bank Trust Co. Ams.*, 748 F.3d 28, 32 (1st Cir. 2014). Although this Court must view all well-pleaded facts in the light most favorable to Plaintiffs, it need not accept the Complaint "wholesale" and may properly disregard "bald assertions" and "unsupportable conclusions." *Id.; see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Furthermore, "[i]n reviewing a Rule 12(b)(6) dismissal, [this Court is] not wedded to the [district] court's rationale and may affirm . . . on any basis made apparent from the record." *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 8 (1st Cir. 2013) (internal quotation marks omitted).

## **ARGUMENT**

**A.      The District Court Correctly Held that Plaintiffs' Claims Are Barred By the California Safe-Harbor Doctrine.**

Plaintiffs raise meritless challenges to the District Court's sound conclusion that California's safe harbor doctrine bars the Complaint.

*First*, the District Court applied well-developed law in holding that the safe harbor doctrine bars consumer fraud claims against Forest for distributing an allegedly false and misleading FDA-approved label.  The District Court's dismissal does not reflect a "sweeping expansion of the safe harbor defense."  Pl. Br. at 22. To the contrary, the holding is consistent with case law across the country.

*Second*, Plaintiffs' reliance on *Wyeth v. Levine* and its progeny is misplaced. Those cases concern whether state law can properly supplement federal law by requiring expanded safety warnings on a drug label reflecting new information not previously considered by the FDA.  Here, Plaintiffs do not seek to augment safety warnings based on new information, but rather seek to contradict the FDA's previous finding of efficacy and its interpretation of the related clinical data.

*Third*, the Complaint does not assert "parallel" claims under federal and state law—to the contrary, the Complaint expressly seeks relief on the basis of a purported state-law duty that differs from the standards set forth in the FDCA and FDA regulations.

*Fourth*, Plaintiffs' last-ditch request that this Court certify the question of the safe harbor's applicability to the California Supreme Court is disingenuous and should be denied.

### 1. The Order Is Supported by Well-Settled Law.

The safe-harbor doctrine, which is broadly recognized at common law and by statute in many states, recognizes that state consumer protection laws should not be used to sanction a party for engaging in a practice expressly permitted or required by federal or state law. The California Supreme Court adopted the safe-harbor doctrine in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527 (Cal. 1999), holding that "courts may not use the unfair competition law to condemn actions the Legislature permits." *Id.* at 542. The *Cel-Tech* court directed that "[i]f the legislature has . . . considered a situation and concluded no action should lie, courts may not override that determination." *Id.* at 541.

Following the *Cel-Tech* decision, California courts consistently have held that the safe-harbor doctrine bars claims brought under the UCL, FAL, and CLRA challenging conduct as deceptive that was specifically authorized by a state or federal regulatory body, whether by statute, regulation, or other action. *See, e.g., Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1165–66 & n.3 (9th Cir. 2012) (affirming dismissal of UCL claims relating to annual fee disclosures in credit card

applications because federal regulations "clearly permit, and indeed require with equal force" the precise disclosure used); *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933–34 (9th Cir. 2011) (affirming dismissal of CLRA and UCL claims relating to fuel pump design reviewed and authorized by California regulatory agency); *Lopez v. Nissan N. Am. Inc.*, 135 Cal. Rptr. 3d 116, 120, 131–33 (Cal. Ct. App. 2011) (rejecting claim that odometer calibrated in compliance with federal requirements violated UCL because manufacturer did not disclose additional information).

Most recently, in *Loeffler v. Target Corp.*, 324 P.3d 50 (Cal. 2014), the California Supreme Court affirmed the dismissal of CLRA and UCL claims premised on a retailer's conduct that complied with the regulatory regime governing collection of California state sales taxes. The Court reiterated that "the reach of the [California consumer protection statutes] is . . . not without limit" and may not be used to challenge conduct that was expressly permitted by statute or regulation. *Id.* at 76–77.

Courts across the country have applied state-law safe harbors to dismiss consumer fraud claims similar to those here that seek to hold a drug manufacturer liable for advertising a product in a manner consistent with its FDA-approved label. For example, in *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934 (7th Cir. 2001), the Court of Appeals affirmed the dismissal of claims under the Illinois Consumer Fraud Act where the challenged statements by the defendant's consumer

hotline telephone operator were consistent with the drug's FDA-approved label and applicable FDA regulations. *Id.* at 941–43. In applying the Illinois safe harbor, the court observed that the manufacturer was "not just specifically authorized" to make the statements in question, but "required to do so" by FDA regulations. *Id.* at 941. Similarly, in *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228 (S.D. Fla. 2007), the court concluded that the Florida and Massachusetts safe harbors bar consumer fraud claims directed at advertisements that "derive from, and largely comport with, the approved [prescription drug] label" because such statements are "implicitly authorized by the FDA." *Id.* at 1234.[19]

Here, Plaintiffs do not allege that Forest disseminated advertisements or made representations that were inconsistent with or unsupported by the FDA-approved label, or even that Forest made statements "derived from" the label. Rather, they attack *the FDA-approved label itself* as false and misleading. It is difficult to imagine a more compelling case in which to apply the safe-harbor doctrine. Pursuant to its exclusive statutory authority, the FDA reviewed and

---

[19] *See also Ball v. Takeda Pharm. Am., Inc.*, 963 F. Supp. 2d 497, 507–08 (E.D. Va. 2013) (dismissing consumer protection claims pursuant to Virginia safe harbor premised on statements consistent with FDA-approved label); *DePriest v. AstraZeneca Pharm., L.P.*, 351 S.W.3d 168, 177–78 (Ark. 2009) (collecting cases dismissing consumer fraud claims predicated on alleged misrepresentations consistent with FDA-approved drug labels); *Prohias v. AstraZeneca Pharm., L.P.*, 958 So.2d 1054, 1056 (Fla. Dist. Ct. App. 2007) (applying Florida safe harbor to dismiss claim based on drug advertising consistent with FDA-approved label).

approved the efficacy statements and descriptions of clinical study data in Lexapro's label and determined, based on the agency's expert judgment, that they are not false or misleading in any particular.[20]   Once approved, Forest was required to distribute the FDA-approved label at risk of criminal penalty if it failed to do so. *See* 21 U.S.C. § 331(o); *see also id.* §§ 331(c), 333(a) & 352(a), (c).

Plaintiffs rely on irrelevant cases focused on advertising and promotional statements that were *inconsistent* with an FDA-approved label.  For example, in *Ledwick v. AstraZeneca Pharmaceuticals, LP*, No. BC 324 518 (Cal. Super. Ct., Sept. 21, 2005) (Appx. at 86–100), the plaintiffs alleged that the defendant drug manufacturer violated California consumer protection laws by engaging in an advertising campaign that marketed the drug Nexium as superior to Prilosec through affirmative misrepresentations to consumers and physicians.  *See* Appx. 88 (*Ledwick* at 3).  However, Nexium's FDA-approved label did not "even mention[] Prilosec, much less demonstrate[] Nexium's superiority to it."  *Id.* at 95 (*Ledwick* at 10).  As a result, there was no basis to conclude that "Nexium's labeling

---

[20]   *See, e.g.*, *Prohias*, 490 F. Supp. 2d at 1235 ("[I]nformation included in the labeling of a new drug reflects a determination by the FDA that the information is not 'false or misleading.'" (citations omitted)); *Cytyc Corp. v. Neuromedical Sys., Inc.*, 12 F. Supp. 2d 296, 301 (S.D.N.Y. 1998) (holding statements in FDA-approved label have been determined not to be "false or misleading"); *Smithkline Beecham Consumer Healthcare, L.P., v. Johnson & Johnson-Merck Consumer Pharms., Co.*, Nos. 95 CIV. 7011 (HB), 95 CIV. 7688 (HB), 1996 WL 280810, at *13 (S.D.N.Y. 1996) (finding advertisements were "neither facially false nor misleading" where they were "based on the package labelling [sic] approved by the FDA").

affirmatively support[ed] defendants' claim that Nexium is superior to Prilosec" or that the FDA had specifically authorized the defendant to market Nexium as superior to Prilosec.[21] *Id.* at 95–98 (*Ledwick* at 10–13).

Plaintiffs also cite *Begley v. Bristol-Myers Squibb Co.*, Nos. 06–6051 (FLW), 06–6269 (FLW), 2009 WL 5216967 (D.N.J. Dec. 30, 2009), in which the district court declined to apply the safe harbor to dismiss Illinois consumer fraud claims premised on pharmaceutical advertising because the issue "ha[d] not been adequately briefed by the parties,"[22] but suggested that it *would* be inclined to apply the safe harbor if defendants had complied with FDA regulations and advertised the relevant product consistent with its FDA-approved labeling. *Id.* at *6–7.[23]

---

[21] *Ledwick* did not explicitly address California's safe harbor doctrine, but instead discussed concepts relevant to the safe harbor and federal preemption in the context of a general denial of the defendants' demurrer.

[22] Instead, the court dismissed the consumer fraud claims for failure to plead proximate causation. *Begley,* 2009 WL 5216967, at *9–10.

[23] Plaintiffs' citation to *State v. Eli Lilly & Co.*, No. 2007–CP–42–1855, 2009 WL 6058384 (S.C. Ct. Com. Pl. Sept. 22, 2009), is inapposite. There, a state court denied defendant drug manufacturer's motion for summary judgment, holding that use of an FDA-approved label did not immunize the manufacturer from liability under the South Carolina Unfair Trade Practices Act ("SCUTPA") where the plaintiff alleged that the label did not adequately disclose a known safety risk. 2009 WL 6058384, at *12–13. Citing *Wyeth v. Levine*, 555 U.S. 555 (2009), the court held that because the defendant could "unilaterally amend its labeling" to include additional safety-related disclosures without prior FDA authorization, the existence of the label did not bar an action under the SCUTPA. 2009 WL 6058384, at *11. Here, Plaintiffs' challenge does not pertain to inadequate safety warnings nor could Forest "unilaterally amend"

In this case, as the District Court explained, the crux of Plaintiffs' argument—that the safe harbor doctrine is inapplicable because neither federal law nor the FDA has "authorized Forest to conceal important efficacy information from consumers and prescribers"—completely misses the mark.  *See* Pl. Br. at 25; Pl. Add. 60 (Order at 9).  The relevant fact is that the FDA has *specifically authorized* Forest to distribute Lexapro's label after finding that it is not false or misleading, and Forest is required by federal law to do so.  Furthermore, Plaintiffs base their claims on a hypothetical system of drug regulation that would require manufacturers to go above and beyond the requirements of federal law by disclosing in a drug label the "clinical significance" of the drug's effectiveness.  *See, e.g.*, Appx. 52–53 (Compl. ¶ 24); Pl. Br. at 20.  However, "[t]his is not the system currently established" by the FDCA, and California consumer protection statutes "cannot properly be interpreted to impose on [drug manufacturers] a duty with respect to [labeling] that is contradicted by the statutory scheme governing [drug labeling]."  *See Loeffler*, 324 P.3d at 76 (dismissing UCL and CLRA claims "premised on a hypothetical system" imposing requirements contrary to the relevant statutory scheme governing collection of sales tax reimbursements).

---

Lexapro's label to correct the alleged misrepresentations and omissions.  *See infra* Part B (pp. 34–42).

In sum, permitting claims against a drug manufacturer for using an FDA-approved label would impermissibly allow private plaintiffs to use the consumer protection laws to "condemn actions" the FDA not only expressly permitted, but which federal law requires. *Cel-Tech*, 973 P.2d at 542. Plaintiffs' claims are barred by the safe harbor doctrine.

### 2.    The Order Is Not Inconsistent with *Wyeth v. Levine*.

Plaintiffs contend the District Court misapplied the safe-harbor doctrine by failing to account for the complementary federal–state system of drug regulation described in *Wyeth v. Levine*. *See* Pl. Br. at 27–39. To the contrary, the District Court properly recognized that *Wyeth* and its progeny concern an entirely different context—whether a plaintiff can pursue failure-to-warn claims under state tort law on a theory that a manufacturer has a state-law duty to add enhanced safety warnings to an FDA-approved label based on new information received by the manufacturer. *See Wyeth*, 555 U.S. at 568–81 (holding state-law failure-to-warn claims in this context do not conflict with federal law and are not preempted); *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2581–82 (2011) (dismissing as preempted state-law failure-to-warn claims that conflicted with federal law

governing generic manufacturers).[24]    By contrast, Plaintiffs seek to pursue consumer fraud claims on the theory that a manufacturer has a state-law duty to alter an FDA-approved label in a manner that *contradicts* the FDA's efficacy findings based on an alternative interpretation of data *already considered* by the FDA.  *Wyeth* has no applicability here.

Plaintiffs note that the Supreme Court has acknowledged that "*federal law establishes no **safe-harbor** for drug companies.*"    Pl. Br. at 30 (emphasis in original) (citing *Bartlett*, 133 S. Ct. at 2476).  But Plaintiffs' use of this quote is misleading to the extent it implies any relevance to the applicability of consumer protection safe harbors created by state law.  The full context of the quoted portion of the majority opinion in *Bartlett* demonstrates that the reference to "safe harbors" concerns only those created by means of federal preemption.    Indeed, neither *Wyeth* nor its progeny contain a single reference to the applicability of safe harbors created by state law.

Plaintiffs also suggest the District Court improperly "viewed the FDA's regulation of drugs as setting both the floor and ceiling of enforceable law."  Pl. Br. at 21.  That contention is meritless.  The District Court merely held that where

---

[24]    *See also Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2476–80 (2013) (dismissing as preempted state-law design-defect claims that conflicted with federal law governing generic manufacturers).

the FDA has been specifically entrusted to determine whether a drug is effective and whether the drug's label is false or misleading in any way, the safe harbor "applies to bar a claim that the label [is] false or misleading."  Pl Add. 60 (Order at 9).  This holding applies California law; it does not set a ceiling or a floor under federal law.  Moreover, in no way does the District Court's holding bar failure-to-warn or similar state tort claims premised on drug labeling that, despite having been approved by the FDA, inadequately warns of known safety risks that became apparent from new information not previously considered by the FDA (the precise claims at issue in the "floor vs. ceiling debate" addressed by *Wyeth*).

Plaintiffs' assertion that the District Court relied on outdated, abrogated case law is also meritless.  *See* Pl. Br. at 36 (*citing Prohias v. Pfizer, Inc.,* 490 F. Supp. 2d 1228 (S.D. Fla. 2007); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig. ("In re Bextra"),* No. M:05–1699 CRB, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006); and *Penn. Emp. Benefit Trust Fund v. Zeneca, Inc. ("Penn. Employees I"),* No. Civ. 05–075–SLR, 2005 WL 2993937 (D. Del. Nov. 8, 2005)). Nothing in *Prohias* nor the cases cited by *Prohias* was invalidated by *Wyeth* or its progeny.  490 F. Supp. 2d 1228 (S.D. Fla. 2007).  Only a portion of the opinion in *In re Bextra* (addressing the force of the FDA's 2006 Preamble)—which is not

relevant to the issues in this appeal—was abrogated by *Wyeth*.[25]  The application of the safe harbor in *Penn. Employees I* was reversed by the Third Circuit because the claims were premised on advertising that was not clearly supported by the labeling. *Penn. Emp. Benefit Trust Fund v. Zeneca, Inc. ("Penn. Employees II")*, 499 F.3d 239, 244 (3d Cir. 2007) (noting "[d]istinction between labeling and marketing is significant for regulatory purposes" and that "federal approval of labeling does not necessarily authorize marketing practices").  Here, Plaintiffs challenge Lexapro's label itself—not marketing statements inconsistent with or unsupported by the label.[26]

---

[25]  Plaintiffs suggest the holding in *In re Bextra* was "based on administrative deference to the FDA 2006 preamble," which was subsequently accorded no deference by *Wyeth*, and therefore was "abrogated by [*Wyeth*]."  Pl. Br. at 37.  In *Wyeth*, the Supreme Court held that the FDA's 2006 Preamble did not establish that federal regulation of prescription drugs served as both a floor and a ceiling of federal drug regulation such that *every* claim premised on the sufficiency of a drug's label is preempted.  555 U.S. at 581.  The Supreme Court recognized, however, that a state-law duty to revise drug labeling in a manner that would *conflict* with a conclusive determination by the FDA *is* preempted.  *See id.* at 571–73.  In short, under *Wyeth*, state law may require more than federal law, but it cannot impose requirements *inconsistent* with federal law.  The purported state-law duty in *In re Bextra* imposed requirements inconsistent with the expert judgments of the FDA and, as a result, the portion of that case relevant here was not "abrogated" by the Supreme Court's holding in *Wyeth*.  *In re Bextra*, 2006 WL 2374742, at *10.

[26]  As Plaintiffs note, the Third Circuit's decision in *Penn. Employees II*—which did not apply the safe harbor—was vacated and remanded by the Supreme Court for further consideration in the wake of *Wyeth*.  556 US. 1101 (2009).  The claims were subsequently dismissed without reference to the safe harbor or preemption.  *See Penn. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 480–84 (D. Del. 2010).

Plaintiffs boldly assert that "nearly every" post-*Wyeth* court has concluded that the safe harbor does not apply.  Pl. Br. at 32–33.  However, not a single case cited by Plaintiffs involved a claim that an FDA-approved prescription drug label was false or misleading.  Instead, each case cited by Plaintiffs involved alleged misrepresentations in food labels or homeopathic over-the-counter ("OTC") consumer product labels that are not subject to the rigorous pre-marketing review and approval process applicable to prescription drug labels.[27]  Furthermore, Plaintiffs' food and homeopathic OTC cases concerned alleged statements that were not specifically authorized by the FDA,[28] or were inconsistent with or

---

[27]  Although the FDA regulates food and homeopathic OTC products, it does not review and approve or otherwise specifically authorize labels for individual food and homeopathic OTC products.  *See Samet v. Procter & Gamble Co.*, No. 5:12–CV– 01981 PSG, 2013 WL 3124647, at *3 n.37 (N.D. Cal. June 18, 2013) (noting FDA food labels are not pre-approved); *Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177, 1181 (C.D. Cal. 2011) (noting FDA does not review individual homeopathic OTC products for safety, efficacy, or compliance with labeling requirements).

[28]  *See Pardini v. Unilever U.S., Inc.*, 961 F. Supp. 2d 1048, 1058 & n.6 (N.D. Cal. July 9, 2013) (declining to apply safe harbor where food labeling practice was not "expressly permitted by FDA"); *Bronson v. Johnson & Johnson, Inc.*, No. C 12– 04184 CRB, 2013 WL 1629191, at *7 (N.D. Cal. Apr. 16, 2013) (declining to apply safe harbor to food label claim where applicable FDA regulations were scant); *Delarosa*, 818 F. Supp. 2d at 1189 (declining to apply safe harbor to homeopathic OTC labeling claim where "the FDA has not set up a comprehensive process to evaluate the safety or efficacy" of such products); *Van Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1075–76 (E.D. Cal. 2010) (declining to apply safe harbor to food label claim because there was "no law which expressly authorize[d] defendant's conduct" despite "informal" FDA policy).

violated a relevant FDA regulation.[29]   Neither circumstance is presented in the Complaint.

Furthermore, none of the cases cited by Plaintiffs relied on *Wyeth* in declining to apply the safe harbor doctrine.  Pl. Br. at 32–33.  To the contrary, in cases concerning prescription drug labels, courts continue to apply the safe harbor doctrine to bar consumer protection claims alleging that FDA-approved statements are false or misleading.  *See, e.g., Ball*, 963 F. Supp. 2d at 507–08 (applying Virginia safe harbor).  Accordingly, the District Court properly recognized that there is "no justification" for extending *Wyeth* to "preclude state safe harbor defenses to claims arising under state consumer protection law."   Pl. Add. 62 (Order at 11).

### 3.    The Order Did Not Fail to Take Account of Purported "Parallel" Violations of State and Federal Law.

Plaintiffs' assertion that the District Court "failed to consider that the complaint alleged conduct that violated both state *and* federal law," and therefore missed the fact that federal law does not authorize the withholding of material

---

[29]   *See Samet*, 2013 WL 3124647, at *6 (permitting food label claim based on allegation defendant violated governing FDA regulation); *Lynch v. Tropicana Prods., Inc.*, No. 2:11–cv–07382 (DMC) (JAD), 2013 WL 2645050, at *6 (D.N.J. June 12, 2013) (declining to apply safe harbor where food label claim involved "alleged failure to meet the requirements of federal law"); *cf. Bruton v. Gerber Prods. Co.*, 961 F. Supp. 2d 1062, 1084 (N.D. Cal. 2013) (permitting food label claim alleging violation of both state and federal law).

information, is simply bizarre.[30]  Pl. Br. at 39.  *First*, the Complaint does not allege any violation of federal law.  To the contrary, it explicitly disclaims any intent to enforce FDA regulations and seeks to establish an alternative standard for prescription drug efficacy and labeling (*i.e.*, one based on "clinical significance').[31]  *Second*, the pertinent fact is that the FDA *expressly authorized* Forest's use of the Lexapro label, not that FDA regulations authorize violations of state law.  *Third*, even if Plaintiffs had alleged a violation of state law that paralleled federal law, the claim would be preempted.  *See infra* Part B (pp. 34–42).

The FDA was required, as part of its approval process, to verify compliance with each of the federal regulations that Forest purportedly "violated" by distributing Lexapro's FDA-approved label.  The federal regulations Plaintiffs cite are part of voluminous standards governing the language, content, and formatting of prescription drug labels to which manufacturers must adhere when drafting proposed labeling.  *See* Pl. Br. at 40–41 (citing 21 C.F.R. §§ 201.56, 201.57).  As

---

[30]  Discussions of "parallel violations" of state and federal law are normally reserved for cases involving express preemption and are not relevant in cases such as this where the conduct at issue has been approved by a government agency.  *See Lashley v. Pfizer, Inc.*, 750 F.3d 470, 476 (5th Cir. 2014) (per curiam) (noting parallel violations are relevant only in the context of express preemption cases).

[31]  The Complaint also indicates, for good reason, that Plaintiffs are not pursuing a claim for fraud on the FDA.  *See* Appx. 65 (Compl. ¶ 52 n.11).  Any claim alleging the FDA improperly approved the Lexapro sNDA is squarely preempted.  *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001); *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004) (noting state-law claims based on fraud against the FDA are preempted under *Buckman*).

part of the Lexapro sNDA, Forest submitted to the FDA the "proposed text of the [Lexapro] labeling . . . with annotations to the information in the [application] that support the inclusion of each statement in the labeling . . . ." 21 C.F.R. § 314.50(c)(2)(i). The FDA was required to deny the Lexapro sNDA if the proposed labeling was "false or misleading in any particular" or if the labeling otherwise "[did] not comply with the requirements for labels and labeling," including the very requirements cited by Plaintiffs. *Id*. §§ 314.125(b)(6), (8). Thus, to the extent Plaintiffs' state law claims "parallel" (rather than exceed) federal regulations, the FDA has determined that Lexapro's label satisfied those requirements and authorized the distribution of the label.

### 4. Certification to the California Supreme Court is Inappropriate and Unwarranted.

Plaintiffs' fallback position is that the Court should certify to the California Supreme Court the question of whether the safe harbor doctrine applies. *See* Pl. Br. at 43. However, certification is neither necessary nor appropriate. *See Hugel v. Milberg, Weis, Bershad, Hynes & Lerach, LLP*, 175 F.3d 14, 18 (1st Cir. 1999).

*First*, the applicability of California's safe harbor doctrine is established by analogous California cases and other decisions applying the safe-harbor doctrine to consumer protection claims arising from the labeling and marketing of prescription drugs. Where "state law is sufficiently clear to allow [a federal court] to predict its course, certification is both inappropriate and an unwarranted burden on the state

court." *Id.* at 18. The California Supreme Court need not have issued a decision addressing the precise question at issue for California state law to be "sufficiently clear." *In re Engage, Inc.*, 544 F.3d 50, 53 (1st Cir. 2008) (cited by Plaintiffs) ("[E]ven in the absence of controlling precedent, certification would be inappropriate where state law is sufficiently clear to allow us to predict its course."). "[I]n the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Fischer v. Bar Harbor Banking & Trust Co.*, 857 F.2d 4, 7 (1st Cir. 1988) (quotations and citations omitted).

Here, as discussed in Part A.1 (pp. 19–25), cases applying California's safe harbor doctrine readily permit this Court to predict how the California courts would apply the doctrine to these facts. Accordingly, no basis for certification exists. *See, e.g.*, *In re Marron*, 485 B.R. 485, 488 (D. Mass. 2012) (refusing certification even though precedent did not address precise issue at hand); *Sarro v. Philip Morris USA, Inc.*, No. 08–10224–MLW, 2010 WL 1930442, at *4–5 (D. Mass. May 12, 2010) (refusing certification where court could resolve issue "through application of a well-developed body of case law from state and federal courts . . . ." (citations omitted)).

*Second*, Plaintiffs' belated request underscores that certification is unwarranted.  Plaintiffs now seek certification as a "fallback" should their substantive arguments fail to persuade the Court.  In other words, by requesting certification only if this Court "is at all leaning toward affirming the district court's order," Pl. Br. at 43, Plaintiffs apparently take the view that state law is sufficiently clear to allow this Court to rule in their favor, but insufficiently clear to permit the Court to rule against them.  The First Circuit has repeatedly rejected similar attempts to misuse the certification process and has "held with monotonous regularity that certification is inappropriate when the course that the state courts would take is reasonably clear."  *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) ("As a fallback, the plaintiff invites us to certify . . . the question . . . . We decline the invitation."); *Fuller v. Deutsche Bank Nat'l Trust Co.*, 642 F.3d 240, 244 (1st Cir. 2011) (refusing certification where plaintiffs chose to litigate in federal forum and "waited until they lost before asking for certification"); *Fischer*, 857 F.2d at 8 (refusing plaintiffs' attempt to "take two bites at the cherry by applying to state court after failing to persuade the federal court").

## B.   In the Alternative, the District Court's Order Should Be Affirmed Because Plaintiffs' Claims Are Preempted By Federal Law.

Even if the claims were permissible under California law, this Court has ample ground to affirm the Order on the alternative basis that Plaintiffs' claims are preempted by federal law.  *See Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 7

(1st Cir. 2011) (noting court may affirm "on any ground made manifest by the record" (citations omitted)).[32]   Plaintiffs' claims are preempted because Forest cannot satisfy its purported state-law duty without frustrating the objectives of the FDA and violating its own obligations under federal law.

An application of state law that conflicts with federal law is preempted under the Supremacy Clause of the U.S. Constitution.  *See* U.S. Const. art. vi, cl. 2; *see also Mensing*, 131 S. Ct. at 2581.   Conflict preemption exists where an application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Conflict preemption also exists where "it is impossible for a private party to comply with both state and federal requirements."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (citations omitted); *see also Bartlett*, 133 S. Ct. at 2476–77.  A private party cannot so comply unless it can "*independently* do under federal law what state law requires of it."  *Mensing*, 131 S. Ct. at 2579 (emphasis added).  "[W]hen a party cannot satisfy its state duties without the Federal Government's

---

[32]   *See also Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1206–07 (11th Cir. 2011) (affirming decision to compel arbitration on alternative ground of federal preemption); *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030, 1034 & n.4 (9th Cir. 2000) (affirming dismissal of counterclaims as preempted even though "district court did not cite . . . preemption as grounds for dismissal").

special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Id.* at 2581.

Since *Wyeth*, the Supreme Court has reiterated that state-law claims which seek to impose a duty to alter drug labels in a manner that conflicts with federal law are preempted. *See Bartlett*, 133 S. Ct. at 2476–80 (holding state-law design-defect claims against generic manufacturer premised on inadequate labeling are preempted because federal regulations require that generic labels conform to branded labels); *Mensing*, 131 S. Ct. at 2574–75 (same with respect to state law failure-to-warn claims).[33] Courts have also adopted this reasoning in the context of state-law claims that seek to impose duties on branded drug manufacturers. *See,*

---

[33] Other federal courts have likewise found that a broad range of safety-related labeling claims against generic manufacturers seeking to impose state-law duties inconsistent with federal law are preempted, including consumer protection claims. *See, e.g., In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 935 (6th Cir. 2014) (affirming dismissal of consumer protection claims that "challenge[d] label content" where plaintiffs "[did] not identify any representations made other than those contained in the FDA-approved labeling" and generic manufacturer "could not have corrected any alleged misrepresentation without violating federal law"); *Eckhardt v. Qualitest Pharm., Inc.*, 751 F.3d 674, 680 (5th Cir. 2014) (affirming dismissal of consumer protection claims where generic manufacturer's "labeling was FDA-approved" and federal law "forbade" the labeling changes purportedly required by state law); *In re Fosamax Prods. Liab. Litig.*, No. 08–008 (GEB-LHG), 2011 WL 5903623, at *9 (D.N.J. Nov. 21, 2011) (finding consumer protection claims preempted where generic manufacturer "under federal law cannot unilaterally change or update their [drug] labels and simultaneously conform to a state-law duty that requires them to change those labels").

*e.g. Hill v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 943, 957–58 (E.D. Cal. 2013) (excluding as preempted argument suggesting branded drug manufacturer should have changed label formatting where manufacturer could not modify label without prior FDA authorization).

The same result follows here. Allowing Plaintiffs' claims to proceed would permit civil litigants to disrupt the Congressionally dictated framework governing the approval of prescription drugs. The claims would usurp the FDA's sole authority to determine drug effectiveness and to approve related statements in drug labeling, potentially resulting in a conflicting patchwork of drug labels that varies from state to state. *See* 21 U.S.C. § 393(b)(2)(B). Furthermore, Forest could not—and still cannot—independently satisfy its purported state-law duty to alter Lexapro's label without first obtaining the special permission of the FDA—a fact the Complaint freely acknowledges in seeking an order "directing Forest to *seek FDA approval of a new label* that properly discloses Lexapro's efficacy." Appx. 84 (Compl. ¶ 103(c)(i)) (emphasis added).

*First*, the label changes sought by Plaintiffs would directly contradict expert judgments already made by the FDA, thereby interfering with the regulatory scheme designed by Congress. Plaintiffs do not seek merely to require disclosure of "material information" or "more demanding disclosures," as they put it. Pl. Br. at 26, 29. They seek to hold Forest liable for fraud for failing to alter Lexapro's

37

drug label to "disclose" the "material fact" that Lexapro is *not* effective for adolescent depression and that the underlying clinical studies are flawed and suspect—in contradiction to the FDA's previous findings. Unlike in *Wyeth*, the FDA has already reviewed the question of Lexapro's efficacy and the relevant clinical data, and concluded the label is not false or misleading. Indeed, the studies Plaintiffs allege are defective and inaccurately described are the same studies the FDA evaluated and found to be "adequate and well-controlled" during the agency's review of the Lexapro sNDA. *See* Appx. 64–65 (Compl. ¶¶ 50–52).

Requiring that a manufacturer "add information to the labeling . . . based solely on data previously submitted to the FDA would undermine FDA's approval process and could result in unnecessary or confusing information being placed in the labeling for a drug . . . ." Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, & Med. Devices, 73 Fed. Reg. 2848, 2851 (Jan. 16, 2008) (setting forth FDA's rationale for longstanding practice of not permitting unilateral label changes based on information already considered by FDA).[34] Accordingly, principles of conflict preemption bar Plaintiffs' claims. *See,*

---

[34] *See also Buckman*, 531 U.S. at 350–51 (holding state-law claims impliedly preempted where possibility that "disclosures to the FDA, although deemed appropriate by the [FDA], will later be judged insufficient in state court" would interfere with FDA approval process); *Zogenix, Inc. v. Patrick*, No. 14–11689–RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014) (holding state order impliedly preempted because "[i]f [Massachusetts] were able to countermand the FDA's determinations and substitute

*e.g., Prohias*, 490 F. Supp. 2d at 1234 (finding advertising claims preempted where they conflicted with FDA jurisdiction over drug approval and labeling); *In re Bextra*, 2006 WL 2374742, at *10 (N.D. Cal. Aug. 16, 2006) (finding claims preempted that "conflict with the FDA's determination of the proper [label] warning and pose an obstacle to the full accomplishment of the objections of the FDCA"); *cf. Wyeth*, 555 U.S. at 571–73 (noting conflict preemption applies when FDA would not have approved changes made); *In re Fosamax Prods. Liab. Litig.*, 951 F. Supp. 2d 695 (D.N.J. 2013) (finding state-law claims premised on drug label preempted where FDA had previously rejected label change).[35]

*Second*, the only means through which a drug manufacturer can make unilateral changes to a prescription drug label prior to obtaining FDA approval is pursuant to the FDA's Changes Being Effected Regulation (the "CBE Regulation"). The CBE Regulation permits manufacturers to make certain "moderate" changes to drug labeling without prior FDA approval based on "newly

---

its own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health"); *Johnson v. MFA Petroleum Co.*, No. 4:11–CV–00981–DGK, 2014 WL 1292453, at *10–11 (W.D. Mo. Mar. 28, 2014) (dismissing as impliedly preempted Missouri consumer fraud claims premised on allegedly inadequate octane labels mandated by federal law and noting adoption of state-specific labels with additional disclosures would "cause consumer confusion" and undermine purpose of federal legislation).

[35] *See also Hillman*, 133 S. Ct. at 1953 (holding state law is preempted to extent it purports to transform narrow statutory exceptions into "a general license for state law to override [federal law]").

acquired information."  21 C.F.R. § 314.70(c)(6)(iii); 73 Fed. Reg. 2849 (noting CBE Regulation is "narrow exception" to general rule that FDA must pre-approve label changes).  In *Wyeth*, the CBE Regulation allowed Wyeth to unilaterally make the safety-related changes sought by plaintiff before seeking FDA approval, which included providing a stronger warning in light of new information suggesting that users of the drug faced grievous harm, including possible death, if the product was administered by certain methods.  555 U.S. at 570–73.  The Supreme Court held there was no conflict with federal law because Wyeth could make the changes consistent with the CBE Regulation, and thus the plaintiff's state-law failure-to-warn claims were not preempted.  *See id*.

Here, the CBE Regulation is inapplicable because the label changes Plaintiffs seek are not "moderate" changes and are not based on "newly acquired information."  Changes to the "Clinical Studies" section of a drug label are considered "major" (rather than "moderate") changes that require prior FDA approval.  21 C.F.R. § 314.70(b)(2)(v)(A); *see also* U.S. Dep't of Health & Human Servs., *et al.*, *Guidance for Industry: Changes to an Approved NDA or ANDA* 24–25 (2004); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007, 1013–14 (E.D. Mo. 2014) (dismissing consumer protection claims as preempted where defendant could not make "major change" to product without prior FDA approval).  Furthermore, the only information cited in the Complaint that might conceivably

40

be considered "newly acquired information" is a so-called 2011 "meta-study," which does not meet the applicable requirements. Appx. 65–66, 70 (Compl. ¶¶ 54, 60 & n.4); *see also* Appx. 135–44 (Carlo Carandang, et al., *A Review of Escitalopram and Citalopram in Child and Adolescent Depression*, 20 J. Can. Acad. Child & Adolescent Psychiatry 315, 315–24 (2011)); 21 C.F.R. § 314.3(b) (stating "newly acquired information" does not include clinical data already submitted for FDA review). The CBE Regulation recognizes "new analyses of previously submitted data (e.g. meta-analyses)" as "newly acquired information" only where the "studies, events, or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to [the] FDA." 21 C.F.R. § 314.3(b). The "meta-study" cited in the Complaint is not a meta-analysis at all,[36] nor does it reveal any new risks; it is merely an article in a Canadian journal limited to a "literature review" of the studies evaluated by the FDA which opines that Lexapro's FDA approval was "premature." Appx. 135, 144.

Even if the CBE Regulation was applicable, it would not permit these particular changes. The CBE regulation permits a manufacturer to unilaterally

---

[36] A "meta-analysis" is defined as a "quantitative statistical analysis of several separate but similar experiments or studies in order to test the pooled data for statistical significance." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 779 (11th ed. 2004).

"add or strengthen" warnings or instructions related to the safety, dosage or administration of a drug in light of new information received by the manufacturer. 21 C.F.R. § 314.70(c)(6)(iii)(A)-(C).  A manufacturer may also "*delete* false, misleading, or unsupported indications for use or claims for effectiveness" in light of new information.  *Id.* § 314.70(c)(6)(iii)(D).  A manufacturer *may not*, however, "add or strengthen," or otherwise modify, claims relating to efficacy.  *Cf.* §§ 314.70(c)(6)(iii)(A)-(C).  Plaintiffs here seek to require that Forest add to, augment, or otherwise modify sections of the label by providing *additional information* about the clinical studies reviewed by the FDA and "properly disclos[ing] Lexapro's efficacy."  Appx. 84 (Compl. ¶ 103).  Those are substantive changes the CBE Regulation does not permit.

Plaintiffs' claims are preempted.

## CONCLUSION

For all of the foregoing reasons, Appellees respectfully submit that the District Court's Order should be affirmed.

Dated:     September 2, 2014

Respectfully submitted,

/s/ Edwin G. Schallert

SUGARMAN, ROGERS, BARSHAK
& COHEN, P.C.
101 Merrimac Street
Boston, MA 02114
Tel.: (617) 227–3030
Fax.: (617) 523-4001

*Of counsel*:

William F. Benson (#87982)
benson@srbc.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Tel.: (212) 909–6000
Fax: (212) 909–6836

*Of counsel*:

Edwin G. Schallert (#45274)
Kristin D. Kiehn
J. Robert Abraham
Danielle E. Kasten
egschall@debevoise.com
kdkiehn@debevoise.com
jrabraha@debevoise.com
dekasten@debevoise.com

*Attorneys for Defendants-Appellees Forest Laboratories, Inc.
and Forest Pharmaceuticals, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Civ. P. 5(c), Fed. R. App. P. 32(a)(5), and Fed. R. App. P. 32(a)(6), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,694 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally-spaced, Times New Roman, 14-point font.

Dated:    September 2, 2014            Respectfully submitted,


                                       /s/ Edwin G. Schallert

SUGARMAN, ROGERS, BARSHAK        DEBEVOISE & PLIMPTON LLP
& COHEN, P.C.
101 Merrimac Street              919 Third Avenue
Boston, MA 02114                 New York, NY  10022
Tel.:  (617) 227–3030            Tel.:  (212) 909–6000
Fax.: (617) 523-4001             Fax:  (212) 909–6836

*Of counsel*:                      *Of counsel*:

William F. Benson (#87982)        Edwin G. Schallert (#45274)
benson@srbc.com                   Kristin D. Kiehn
                                  J. Robert Abraham
                                  Danielle E. Kasten
                                  egschall@debevoise.com
                                  kdkiehn@debevoise.com
                                  jrabraha@debevoise.com
                                  dekasten@debevoise.com

*Attorneys for Defendants-Petitioners Forest Laboratories, Inc.*
*and Forest Pharmaceuticals, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Edwin G. Schallert, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Docket Activity on September 2, 2014.


/s/ Edwin G. Schallert

Edwin G. Schallert